1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

AHMED DAWOOD AHMED E.S.,[1]   ) Case No. SACV 19-1210-JPR
                         )
            Plaintiff,  )
                         ) **MEMORANDUM DECISION AND ORDER**
        v.            )
                         )
ANDREW M. SAUL,          )
Commissioner of Social     )
Security,               )
                         )
           Defendant.  )
_____ )

**I.    PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision denying his application for Social Security Disability Insurance Benefits ("DIB").  The matter is before the Court on the parties' Joint Stipulation, filed April 17, 2020, which the Court has taken under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed.

---

[1] Plaintiff's name is partially redacted in line with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

## II.   BACKGROUND

Plaintiff was born in 1954.  (Administrative Record ("AR") 128.)  He has a master's degree and worked for approximately 22 years as a sales manager.  (See AR 143, 162; see also AR 44.)  He applied for DIB on April 30, 2013, alleging that he had been unable to work since February 6, 2010 (AR 128-29), because of high blood pressure, diabetes, and "[s]tint [sic] in artery" (AR 142).  After his claim was denied initially and on reconsideration, he requested a hearing.  (AR 82-83.)  A hearing was held on October 8, 2014, at which Plaintiff, who was represented by counsel, testified (AR 26, 29-42), as did a vocational expert (AR 42-44).  In a written decision dated December 2, 2014, the ALJ found him not disabled.  (AR 19; see AR 14-19.)  He requested review from the Appeals Council (AR 9), but it denied his request (AR 1).

Plaintiff filed an appeal in this Court on May 20, 2016, seeking review of the Commissioner's final decision.  (AR 412-14.)  On November 21, 2016, by stipulation of the parties, the Court remanded the action for further administrative proceedings.  (AR 419-24.)  On July 19, 2018, the ALJ conducted another hearing, at which Plaintiff, who was again represented by counsel, and a VE again testified.  (AR 376, 379-90.)  In a written decision dated August 27, 2018, the ALJ again found Plaintiff not disabled.  (AR 369; see AR 361-69.)  The Appeals Council considered Plaintiff's written objections to the ALJ's decision and found no reason to assume jurisdiction.  (AR 352-54.)  This action followed.

2

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is "more than a mere scintilla but less than a preponderance." Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's. Id. at 720-21.

**IV.   THE EVALUATION OF DISABILITY**

People are "disabled" for Social Security purposes if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous

3

1  period of at least 12 months.   42 U.S.C. § 423(d)(1)(A); <u>Drouin v.</u>

2  <u>Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir. 1992).

3      A.   <u>The Five-Step Evaluation Process</u>

4      The ALJ follows a five-step sequential evaluation process in

5  assessing whether a claimant is disabled.   20 C.F.R.

6  § 404.1520(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th

7  Cir. 1995) (as amended Apr. 9, 1996).   In the first step, the

8  Commissioner must determine whether the claimant is currently

9  engaged in substantial gainful activity; if so, the claimant is

10 not disabled and the claim must be denied.   § 404.1520(a)(4)(i).

11     If the claimant is not engaged in substantial gainful

12 activity, the second step requires the Commissioner to determine

13 whether the claimant has a "severe" impairment or combination of

14 impairments significantly limiting his ability to do basic work

15 activities; if not, a finding of not disabled is made and the

16 claim must be denied.   § 404.1520(a)(4)(ii) & (c).

17     If the claimant has a "severe" impairment or combination of

18 impairments, the third step requires the Commissioner to

19 determine whether the impairment or combination of impairments

20 meets or equals an impairment in the Listing of Impairments

21 ("Listing") set forth at 20 C.F.R. part 404, subpart P, appendix

22 1; if so, disability is conclusively presumed and benefits are

23 awarded.   § 404.1520(a)(4)(iii) & (d).

24     If the claimant's impairment or combination of impairments

25 does not meet or equal an impairment in the Listing, the fourth

26 step requires the Commissioner to determine whether the claimant

27

28

4

has sufficient residual functional capacity ("RFC")[2] to perform his past work; if so, the claimant is not disabled and the claim must be denied.  § 404.1520(a)(4)(iv).  The claimant has the burden of proving he is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie case of disability is established.  Id.

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy, the fifth and final step of the sequential analysis. §§ 404.1520(a)(4)(v), 404.1560(b).

B.   The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 6, 2010,[3] the alleged onset date.  (AR 363.)  His date last insured was June 30, 2017.  (Id.)  At step two, the ALJ determined that he had severe impairments of "obesity, diabetes mellitus, hypertension, coronary artery disease status post stenting with history of angina pectoris and mitral valve replacement, and right knee tendonitis."  (Id.)  At step three, she found that Plaintiff's

---

[2] RFC is what a claimant can do despite existing exertional and nonexertional limitations.  § 404.1545(a)(1); see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  The Commissioner assesses the claimant's RFC between steps three and four.  Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

[3] Plaintiff worked for part of 2015 and earned almost $25,000.  (AR 515, 520.)

5

impairments did not meet or equal a listing.  (AR 364.)  At step four, she concluded that he had the RFC to perform a limited range of sedentary work:

> [He] can lift and/or carry 10 pounds frequently and occasionally; can stand and/or walk for two hours out of an eight-hour workday; can sit for six hours out of an eight-hour workday; can occasionally climb stairs, but cannot climb ladders, ropes or scaffolds; cannot work at unprotected heights or around moving and dangerous machinery; and can frequently stoop, bend, crouch, crawl, and squat.

(Id.)  He could perform his past relevant work as generally performed in the national economy but not as actually performed. (AR 367-68.)  Accordingly, the ALJ found him not disabled.  (AR 369.)

**V.   DISCUSSION**[4]

Plaintiff contends that the ALJ "impermissibly rejected [his] subjective symptom testimony."  (J. Stip. at 4.)  For the reasons discussed below, the ALJ did not err.

---

[4] In Lucia v. SEC, 138 S. Ct. 2044, 2055 (2018), the Supreme Court held that ALJs of the Securities and Exchange Commission are "Officers of the United States" and thus subject to the Appointments Clause.  To the extent Lucia applies to Social Security ALJs, Plaintiff has forfeited the issue by failing to raise it during his administrative proceedings.  (See AR 25-46, 222-23, 352-54, 376-92, 434-54, 505-07); Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999) (as amended) (plaintiff forfeits issues not raised before ALJ or Appeals Council); see also Kabani & Co. v. SEC, 733 F. App'x 918, 919 (9th Cir. 2018) (rejecting Lucia challenge because plaintiff did not raise it during administrative proceedings), cert. denied, 139 S. Ct. 2013 (2019).

6

1        A.   <u>Applicable Law</u>

2        An ALJ's assessment of a claimant's allegations concerning

3   the severity of his symptoms is entitled to "great weight."

4   <u>Weetman v. Sullivan</u>, 877 F.2d 20, 22 (9th Cir. 1989) (as amended)

5   (citation omitted); <u>Nyman v. Heckler</u>, 779 F.2d 528, 531 (9th Cir.

6   1985) (as amended Feb. 24, 1986).  "[T]he ALJ is not 'required to

7   believe every allegation of disabling pain, or else disability

8   benefits would be available for the asking, a result plainly

9   contrary to 42 U.S.C. § 423(d)(5)(A).'"  <u>Molina v. Astrue</u>, 674

10  F.3d 1104, 1112 (9th Cir. 2012) (quoting <u>Fair v. Bowen</u>, 885 F.2d

11  597, 603 (9th Cir. 1989)).

12       In evaluating a claimant's subjective symptom testimony, the

13  ALJ engages in a two-step analysis.  <u>See Lingenfelter</u>, 504 F.3d

14  at 1035-36; <u>see also</u> SSR 16-3p, 2016 WL 1119029, at *3 (Mar. 16,

15  2016).  First, the ALJ must determine whether the claimant has

16  presented "objective medical evidence of an underlying impairment

17  [that] could reasonably be expected to produce the pain or other

18  symptoms alleged." <u>Lingenfelter</u>, 504 F.3d at 1036 (citation

19  omitted).  If such objective medical evidence exists, the ALJ may

20  not reject a claimant's testimony "simply because there is no

21  showing that the impairment can reasonably produce the <u>degree</u> of

22  symptom alleged."  <u>Id.</u> (citation omitted & emphasis in original).

23       If the claimant meets the first test, the ALJ may discount

24  the claimant's subjective symptom testimony only if he makes

25  specific findings that support the conclusion.  <u>See Berry v.</u>

26  <u>Astrue</u>, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent a finding or

27  affirmative evidence of malingering, the ALJ must provide a

28  "clear and convincing" reason for rejecting the claimant's

7

testimony.  <u>Brown-Hunter v. Colvin</u>, 806 F.3d 487, 493 (9th Cir.
2015) (as amended) (citing <u>Lingenfelter</u>, 504 F.3d at 1036);
<u>Treichler v. Comm'r of Soc. Sec. Admin.</u>, 775 F.3d 1090, 1102
(9th Cir. 2014).  The ALJ may consider, among other factors,
the claimant's (1) reputation for truthfulness, prior
inconsistent statements, and other testimony that appears less
than candid; (2) unexplained or inadequately explained failure to
seek treatment or to follow a prescribed course of treatment;
(3) daily activities; (4) work record; and (5) physicians' and
third parties' testimony.  <u>See Rounds v. Comm'r Soc. Sec. Admin.</u>,
807 F.3d 996, 1006 (9th Cir. 2015) (as amended); <u>Thomas v.
Barnhart</u>, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the ALJ's
evaluation of a plaintiff's alleged symptoms is supported by
substantial evidence in the record, the reviewing court "may not
engage in second-guessing."  <u>Thomas</u>, 278 F.3d at 959 (citation
omitted).

In evaluating a claimant's subjective symptoms, the ALJ
considers "all of the available evidence" in the record,
§ 404.1529(c)(1), including the "objective medical evidence,"
§ 404.1529(c)(2), and "other evidence" from medical sources,
§ 404.1529(c)(3).  Objective medical evidence is obtained through
"medically acceptable clinical and laboratory diagnostic
techniques."  § 404.1529(c)(2).  "[O]ther evidence" is everything
else relevant to evaluating pain, including, for example,
"medical opinions about the individual's symptoms and their
effects" and the "longitudinal record of any treatment and its
success or failure."  SSR 16-3p, 2016 WL 1119029, at *6; <u>see</u>
§ 404.1529(c)(3).

8

Contradiction with the "objective medical evidence" is a "specific and legitimate" basis for rejecting a claimant's subjective symptom testimony. <u>Morgan v. Comm'r of Soc. Sec. Admin.</u>, 169 F.3d 595, 600 (9th Cir. 1999); <u>see</u> § 404.1529(c)(2). But it "cannot form the sole basis for discounting" it. <u>Burch v. Barnhart</u>, 400 F.3d 676, 681 (9th Cir. 2005).

    B.   <u>Applicable Background</u>

        1.   <u>Objective medical and other evidence</u>

           a.   *Heart-related issues*

Plaintiff underwent a "cardiac catheterization"[5] on May 9, 2008, following a "markedly abnormal stress test." (AR 225.) During the catheterization, lesions and "moderate to diffuse plaquing" of Plaintiff's "LAD"[6] artery were discovered. (AR 226.) The artery was inflated with a balloon, and a stent was deployed. (AR 225.) Plaintiff was diagnosed with "[m]ultivessel coronary artery disease." (AR 226.)

On September 4, 2009, Plaintiff underwent another stress test and reported "no chest pain with exercise." (AR 227.) Although he exhibited an "abnormal" electrocardiogram response to exercise, he had no clinical response and "[v]ery good" functional capacity. (<u>Id.</u>) On November 12, 2009, he underwent a

---

[5] Cardiac catheterization is an imaging procedure used to evaluate heart function. <u>See</u> <u>Cardiac Catheterization</u>, Cleveland Clinic, https://my.clevelandclinic.org/health/diagnostics/ 16832-cardiac-catheterization (last visited May 27, 2020).

[6] "LAD" refers to the left anterior descending artery, which supplies the front and bottom of the left ventricle and the front of the septum. <u>See</u> <u>Coronary Arteries</u>, Cleveland Clinic, https://my.clevelandclinic.org/health/articles/ 17063-coronary-arteries (last visited May 27, 2020).

"[l]eft heart catheterization." (AR 262-63.) During the procedure, "significant diffuse" coronary artery disease was noted, involving a "very small nondominant right" coronary artery, which was "extensively diseased," and a "large dominant left circumflex" artery, which had "disease in an obtuse marginal artery and [a] posterior descending artery." (AR 262-63.)

Progress notes from 2008 and 2009, both before and after Plaintiff's stent placement, indicate that although he reported some chest pain, he had no significant functional difficulties, and his symptoms generally improved. For instance, on February 14, 2008, he reported feeling "well," with no chest pain, shortness of breath, palpitations, dizziness, syncope, or leg edema. (AR 238.) On May 5, 2008, he again was "well," with "[n]o effort intolerance" or any other symptoms. (AR 235.) On June 19, 2008, he reported feeling "well," with an "[e]ffort tolerance of walking [two] miles" and no symptoms. (AR 241.) On November 13, 2008, he also said he felt "well," with no symptoms. (AR 244.) On February 26, 2009, he again reported feeling "well," with an "[e]ffort tolerance of walking two to three blocks" and no symptoms. (AR 247.) On May 28, 2009, he noted "chest pain episodes while swimming," but he described them as "brief" and reported no other symptoms. (AR 250.) On October 6, 2009, he said he was "feel[ing] better," with an "[e]ffort tolerance of walking several blocks" and no recent symptoms. (AR 253.)

On June 9, 2011,[7] more than a year after his alleged onset date, Plaintiff saw cardiologist Richard Deits for a consultation. (AR 350-51.) He indicated that he had had "no further angina" since his stent placement in May 2008 and that he could "play sports" and "remain very active" without chest pain or shortness of breath. (AR 350.) Dr. Deits saw "no reason to do a stress test," noting that Plaintiff was "very active and has no symptoms." (AR 351.) At a September 8, 2011 follow-up visit, Plaintiff related that he had been experiencing "increasing fatigue[,] especially with exertion." (AR 348.) He denied any chest pain or shortness of breath, however, and admitted that he was not taking his blood pressure medications routinely. (Id.) Dr. Deits noted that "[m]ore than likely [Plaintiff's] fatigue, especially with exertion[,] is related to his hypertension" and "discussed this" and "the need to be compliant with his medications" with Plaintiff. (Id.) He noted that he was "very active" and saw "no reason to do a stress test at this point in time." (Id.) On December 29, 2011, Plaintiff reported that he had "[l]ess fatigue." (AR 344.) He said that he had "DOE"[8] and that although he "used to play tennis for hours, now he [could]

---

[7] The AR contains no medical records from the February 2010 alleged onset date to June 2011. Although Plaintiff stopped working on the alleged onset date, he indicated in his initial Disability Report that he did so "[b]ecause of other reasons," namely, his "[p]osition was terminated." (AR 142.)

[8] "DOE" stands for "dyspnea on exertion." Medical Abbreviation List By Abbreviation, N.D. State Gov't, http://www.ndhealth.gov/familyplanning/image/cache/medical_terms_in_order_by_abbreviation.pdf (last visited May 27, 2020).

only last 30-45 minutes." (Id.)  Dr. Deits noted that his blood

pressure was "elevated" and that "[m]ore than likely his fatigue,

especially with exertion, is related to his hypertension." (Id.)

At a January 12, 2012 follow-up visit, Plaintiff had lost

two pounds, but his blood pressure "remain[ed] up." (AR 342.)

Dr. Deits noted that he "did not do as instructed" by beginning

his new blood-pressure medication and instead continued with his

previous medication. (Id.)  Plaintiff reported on January 26,

2012, that he had started "tak[ing] his medications correctly"

and "fe[lt] better" with the new blood-pressure medication. (AR

340.)  Dr. Deits noted that his blood pressure was "much better"

and that his coronary artery disease was "[s]table." (Id.)

During an April 26, 2012 follow-up visit, Plaintiff said he had

traveled to Dubai and had had "no problems." (AR 338.)  He

denied any chest pain, shortness of breath, DOE, "orthopnea,"[9]

"PND" (paroxysmal nocturnal dyspnea),[10] edema, dizziness,

lightheadedness, palpitations, or syncope. (Id.)  On July 26,

2012, Plaintiff again denied those symptoms. (AR 336.)  On

December 6, 2012, he reported that he had traveled to Egypt and

had "had no problems." (AR 334.)  He denied any symptoms. (Id.)

On May 2, 2013, he said his blood-pressure readings had been

"normal" and denied any symptoms. (AR 332.)  Dr. Deits wrote him

a letter stating that he "may work in any field without

[9] Orthopnea is discomfort in breathing brought on or
aggravated by lying flat.  Stedman's Medical Dictionary 1277-78
(27th ed. 2000).

[10] Paroxysmal nocturnal dyspnea is shortness of breath
"appearing suddenly at night, usually waking the patient from
sleep."  Stedman's Medical Dictionary 556 (27th ed. 2000).

restrictions." (AR 331.) On November 7, 2013, Plaintiff brought his blood-pressure readings, which were "normal," to a follow-up visit. (AR 329.) He denied any symptoms. (Id.)

On July 14, 2014, he told Dr. Diets that he had "just returned from Egypt." (AR 327.) He denied any chest pain, shortness of breath, DOE, orthopnea, PND, edema, dizziness, lightheadedness, palpitations, or syncope. (Id.)

On January 12, 2015, Plaintiff underwent an echocardiogram, with normal findings, including "[n]ormal left ventricular size and function" and "[n]o evidence of significant valvular dysfunction." (AR 719.) On November 24, 2015, he underwent another echocardiogram, which demonstrated that his left ventricle "[s]ize [was] normal," with "septal wall dyskinesis," "mild concentric left ventricular hypertrophy," and "no diastolic dysfunction." (AR 709.) The aortic valve showed "no evidence of stenosis but there [was] mild regurgitation." (Id.) All other findings were normal. (AR 709-10.)

Meanwhile, on January 22, 2015, Plaintiff reported at a cardiology follow-up visit that he "got a job" and denied chest pain, shortness of breath, DOE, orthopnea, PND, edema, dizziness, lightheadedness, palpitations, or syncope. (AR 717.) Dr. Deits noted that his echocardiogram was within normal limits. (AR 718.) At a June 4, 2015 follow-up visit, Plaintiff had "not lost weight," and his blood pressure "remained elevated." (AR 715.) But he denied any symptoms. (Id.) Notes from August 31, 2015, indicate that Dr. Deits reviewed Plaintiff's laboratory results, was "concerned" about several of them, and would "add a [s]tatin" to his prescription medications. (AR 713.) But Plaintiff again

13

denied any symptoms.  (Id.)  On November 16, 2015, Plaintiff
indicated that "[a]bout 10 days" before the appointment, "while
in bed he suddenly lost vision" and fainted.  (AR 711.)  His wife
"struck his chest" until he regained consciousness.  (Id.)  He
then "took a shower and drove himself to [the hospital]," where
he had coronary artery bypass graft surgery.  (Id.)  He stated
that he had "soreness from the CABG," but he otherwise denied
chest pain, shortness of breath, DOE, orthopnea, PND, edema,
dizziness, lightheadedness, palpitations, or syncope.  (Id.)  The
postsurgery electrocardiogram indicated "[s]inus [r]hythm" and
"[n]on-specific T waves anterolaterally."  (AR 712.)  On November
30, 2015, Plaintiff "continue[d] to have wound pain" but
otherwise denied any symptoms.  (AR 707.)  Dr. Deits noted that
the echocardiogram indicated "[s]eptal dyskinesia."[11]  (AR 708.)
Notes from a December 21, 2015 follow-up visit state that
Plaintiff was "doing well" and denied any symptoms.  (AR 699.)
Dr. Deits noted that he would discontinue one of Plaintiff's
medications because he was "not having anymore [sic] chest pain."
(AR 700.)

Progress notes from a May 23, 2016 follow-up visit state
that Plaintiff was "requesting an extension of his disability."
(AR 701.)  He said he did not "exercise as much" and got
"fatigued with exertion," but he denied chest pain, shortness of
breath, DOE, orthopnea, PND, edema, dizziness, lightheadedness,

---

[11] Dyskinesia is difficulty in performing voluntary
movements.  Stedman's Medical Dictionary 553 (27th ed. 2000).  A
septum is a thin wall dividing two cavities or masses of softer
tissue.  Id. at 1620.

14

palpitations, or syncope.  (Id.)  Dr. Deits noted that he was
"stable from a cardiac" point of view, "advised him to
progressively increase his exercise," and opined that he was not
"disabled from a cardiac POV."  (AR 702.)

Cardiology progress notes dated August 22, 2017, and March
1, 2018, indicated normal findings on physical examination and
that Plaintiff was "doing well," denying any chest pain,
shortness of breath, orthopnea, dizziness, syncope, palpitations,
or lower extremity edema.  (AR 764, 766.)  Other than his
elevated blood-pressure readings and weight, Dr. Deits had noted
generally normal findings during each examination.  (See AR 327,
329, 332, 334, 336, 338, 340, 342, 344, 346, 348, 350, 699, 701,
703, 705, 707, 711-12, 713, 715, 717.)

### b.   Diabetes and other issues

On September 20, 2012, Plaintiff saw Dr. Daniel Uribe,[12] who
diagnosed him with type two diabetes and hypertension.  (AR 275.)
At an October 5, 2012 follow-up visit to obtain lab results, Dr.
Uribe noted "[h]igh A1C"[13] and a fasting blood sugar of "240,"
and he observed that Plaintiff "had been off meds."  (AR 274.)
Dr. Uribe noted at a May 30, 2013 follow-up visit to refill
medication that Plaintiff's weight was down 11 pounds and that
his blood pressure was "118/66."  (AR 273.)  During a June 19,
2013 visit, Dr. Uribe recorded Plaintiff's blood pressure as

---

[12] Dr. Uribe's medical specialty is not apparent from the
record.

[13] A1C is a blood test for type 2 diabetes and prediabetes.
See A1C, MedlinePlus, https://medlineplus.gov/a1c.html (last
visited May 27, 2020).

1  "120/80" but indicated that he was "not following 'good' DM

2  diet." (AR 272.)  Plaintiff saw Dr. Uribe again on July 3, 2013,

3  to check a skin problem with his right leg.  (AR 269.)

4      On August 23, 2016, Plaintiff attended a nephrology

5  consultation with Dr. Herbert S. Tiquia.  (AR 746-47.)  He

6  reported a "history of coronary artery disease, "MI,"[14] and

7  "five-vessel coronary bypass surgery in November 2015." (AR

8  746.)  Dr. Tiquia noted that laboratory studies indicated an

9  "[e]levated serum creatinine" level that was "consistent with

10  likely stage 3 chronic kidney disease due to hypertensive

11  nephrosclerosis." (AR 747.)  But his urinalysis findings were

12  "fairly benign." (Id.)  Dr. Tiquia did "not suspect any

13  secondary systemic disorders such as autoimmune disease or

14  systemic vasculitis" and noted that Plaintiff's diabetes was

15  under "fair control." (Id.)  Dr. Tiquia "had a lengthy

16  discussion with [Plaintiff] regarding the importance of sodium-

17  restricted diabetic diet" "to maintain maximal renal

18  preservation." (Id.)

19      During an April 20, 2017 office visit with osteopath Mark

20  Varallo,[15] Plaintiff complained of "right knee pain after

21

22  _____

23  [14] "MI" is an acronym for "myocardial infarction." Medical
   Abbreviation List By Abbreviation, N.D. State Gov't,
24  http://www.ndhealth.gov/familyplanning/image/cache/
   medical_terms_in_order_by_abbreviation.pdf (last visited May 27,
25  2020).

26  [15] Dr. Varallo primarily practices family medicine. See
   Cal. Dep't Consumer Aff. License Search, https://
27  search.dca.ca.gov (search for "Varallo" under "License Type,"
   "Osteopathic Physician's and Surgeon's") (last visited May 27,
28  2020).

16

carrying a heavy load eight weeks" before the office visit.  (AR 609.)  He described the pain as "aching."  (Id.)  Dr. Varallo noted on examination that Plaintiff's right knee was "painful medially," but he had a "[n]egative Appleys [sic]" test[16] and "no effusion."  (AR 610.)  Dr. Varallo "referred [Plaintiff] to orthopedics" and ordered X-ray imaging of his right knee.  (Id.)  The X-ray findings were normal, revealing "no evidence of fracture," "joint effusion," or "focal bony lesion," and "[b]one mineral density [was] normal."  (AR 662.)

On July 25, 2017, after Plaintiff's date last insured, he saw Dr. Varallo to discuss test results.  (AR 791.)  He noted that Plaintiff's "right knee [was] painful at the insertion of the sartorius,"[17] but he indicated otherwise normal examination findings.  (AR 792.)  Dr. Varallo's assessment was "[d]iabetes mellitus with renal manifestations, uncontrolled."  (Id.)  He indicated that Plaintiff should eat a "diet low in simple carbohydrates" and engage in "30 minutes of exercise daily." (Id.)  He said Plaintiff would be "switched to insulin" if his diabetes was not under control at the next visit.  (Id.) Progress notes from September 17, 2017 indicate that Dr. Varallo again encouraged Plaintiff to follow his diet and engage in "30 [minutes of] walking at least [three or four times] per week." (AR 790.)  He noted again on October 24, 2017, that Plaintiff's

---

[16] An Apley's test is used to evaluate patients for tears in the meniscus of the knee.  See Apley's Test, Physiopedia, https://www.physio-pedia.com/Apley%27s_Test (last visited May 27, 2020).

[17] The sartorius is a superficial anterior thigh muscle. Stedman's Medical Dictionary 1154 (27th ed. 2000).

diabetes was "uncontrolled," again prescribed a "[d]iet low in simple carbohydrates," and indicated that he would "be switched to insulin" if his diabetes was not under control at the next visit. (AR 786.) On November 2, 2017, Plaintiff complained of "skin problems" with "no associated pain." (AR 783.) Dr. Varallo indicated that Plaintiff's "right knee [was] painful at the insertion of the sartorius" and otherwise noted normal findings on examination. (AR 784.) He observed that Plaintiff's diabetes remained "uncontrolled," prescribed a "[d]iet low in simple carbohydrates," and indicated that he would be "switched to insulin" if his diabetes was not under control at the next visit. (Id.) At a November 10, 2017 visit, Dr. Varallo "stressed" the need for "weight reduction" and "reinforced and advocated" that Plaintiff follow his diet. (AR 782.) He "encouraged . . . 30 [minutes of] walking at least [three or four times] per week." (Id.)

On January 17, 2018, Dr. Varallo again noted that Plaintiff's diabetes was "uncontrolled" and prescribed a "[d]iet low in simple carbohydrates" and "30 minutes of exercise daily." (AR 778.) On January 25, 2018, Plaintiff complained of a "cough, runny nose and stuffy nose." (AR 774.) Dr. Varallo noted a "cobblestone appearance to [the] post pharynx and inside of the nares" and otherwise normal findings on physical examination. (AR 775.) He observed that Plaintiff's diabetes remained "uncontrolled" but showed "slight improvement." (AR 776.) Dr. Varallo again advised Plaintiff to follow a "[d]iet low in simple carbohydrates" and to engage in "30 minutes of exercise daily." (Id.) Progress notes from February 1, 2018, state that

Plaintiff's "A1C [was] in [an] increasing trend." (AR 773.) He reported that he was "walking 'a lot nowadays.'" (Id.) Dr. Varallo again noted that he "reinforced" Plaintiff's need to follow his diet and "encouraged" him to walk 30 minutes three or four times a week. (Id.) On April 2, 2018, Dr. Varallo noted that Plaintiff's "[l]ast A1C was 9.1," "reinforced" the need to follow his diet, and again "encouraged" him to walk regularly. (AR 772.)

### c.    State-agency consultants and reviewers

On July 16, 2013, Plaintiff underwent a complete internal-medicine evaluation by Dr. Rocely Ella-Tamayo[18] at Defendant's request. (AR 286-91.) Plaintiff presented with "[d]iabetes mellitus," "[h]igh blood pressure," and "[c]hest pain" and reported symptoms of "occasional numbness and tingling sensation of the extremities," "nocturia," "occasional headache," "rare dizziness without ankle swelling," and "occasional shortness of breath and diaphoresis." (AR 286-87.) He said he was capable of "walk[ing two] blocks" and "pick[ing] up about 10 pounds," and his daily activities included "driv[ing] sometimes," "help[ing] with light housework," "walk[ing] in the yard," "go[ing] on errands," and "go[ing] to the doctor." (AR 287.) Dr. Ella-Tamayo noted on physical examination that Plaintiff was "obese" and recorded his blood pressure as "160/90," but examination findings were otherwise normal. (AR 288-90.) She diagnosed him

---

[18] Dr. Ella-Tamayo primarily practices internal medicine. See Cal. Dep't Consumer Aff. License Search, https://search.dca.ca.gov (search for "Ella-Tamayo" under "License Type," "Physician's and Surgeon's") (last visited May 12, 2020).

19

with "[d]iabetes mellitus," "[h]ypertension," "[c]oronary artery disease status post 1 coronary artery stent placement with history of angina pectoris," and "[o]besity." (AR 290.) She opined that he was restricted in "pushing, pulling, lifting, and carrying to about 20 pounds occasionally, and about 10 pounds frequently," his "[s]itting [was] unrestricted," he was "able to stand and walk 6 hours out of an 8-hour workday with normal breaks," he could "kneel without restriction" and "squat frequently," and he had "no significant functional impairment [of] the hands." (AR 291.)

On August 12, 2013, state-agency physician V. Phillips[19] reviewed Plaintiff's records and generally agreed with Dr. Ella-Tamayo's findings, differing from them only in finding that Plaintiff could sit (with normal breaks) for a total of about six hours in an eight-hour workday, had no limitations for pushing or pulling other than those for lifting and carrying, and had no postural, visual, communicative, or environmental limitations. (AR 54-55.) On December 16, 2013, state-agency physician C. Friedman[20] reviewed Plaintiff's records and adopted Dr. Phillips's findings. (AR 65-66.)

2. <u>Plaintiff's statements and testimony</u>

In Plaintiff's undated initial Disability Report, he stated

---

[19] Dr. Phillips primarily practices family or general medicine. (<u>See</u> AR 47 (showing signature code of 12)); Soc. Sec. Admin., Program Operations Manual System (POMS) DI 24501.004 (May 5, 2015), https://secure.ssa.gov/apps10/poms.nsf/lnx/0424501004 (signature code 12 indicates family or general practice).

[20] Dr. Friedman's medical specialty is not apparent from the record.

1  that his ability to work was limited by "[h]igh blood pressure,"
2  "[d]iabetes," and "[s]tint [sic] in artery." (AR 142.) In a
3  questionnaire dated June 28, 2013, he claimed that "[f]atigue,"
4  "weakness," and "[s]hortness of [b]reath" prevented him from
5  carrying out a normal workday. (AR 177.)

6       At the October 8, 2014 hearing, Plaintiff testified that he
7  last worked in January 2010. (AR 29.) He "got laid off" because
8  after he "had a stent put in one of [his] arter[ies]," he found
9  "it very difficult health-wise to travel a lot." (Id.) He
10 testified that when he traveled by plane to Saudi Arabia and
11 Egypt earlier that year, he wound up "unconscious" on the plane.
12 (AR 30.) He woke up, but "when [he] arrived, [he] couldn't stand
13 up," he "was dizzy," and "they had to bring a wheelchair." (Id.)
14 He testified that he became "fatigued" "when [he] d[id] any
15 physical exercising." (AR 31.) Although he "used to jog" "2
16 miles no problem," "now if [he] walk[ed] 15 minutes," he got
17 "dizzy" and had "hard breath." (Id.) He would then have to lie
18 or sit down for "at least" 30 minutes. (Id.) He got "very
19 fatigued" after "pull[ing a] laundry basket for [his] wife" for
20 "50 feet." (Id.) He said he could not work in a sales job that
21 did not require travel because he got "fatigued after one hour"
22 and his "eyes started to get blurry." (AR 33-34.) He also could
23 not work as a car salesman because he could not do the "mov[ing]
24 around" and "physical work" required "to deliver a car," among
25 other things. (AR 34.) He testified that if he walked 100 feet,
26 his eyes got "numby" and he felt "fatigue[d]." (AR 37.) He
27 could not "read for more than 10 or 15 minutes" before his vision
28 got "blurry." (AR 38.)

1    At the July 19, 2018 hearing, Plaintiff testified that since

2 the previous hearing, he had "had a massive heart attack" and

3 bypass surgery.  (AR 379.)  He testified that he now "became

4 fatigued" "if [he] d[id] even very light work at all to help

5 [his] wife," he "los[t] focus," and his memory was "not as good

6 as it used to be."  (Id.)  He had "started losing records of

7 dates," could not "remember the name[s]" of his medications, and

8 he "sometimes" forgot instructions his wife gave him.  (AR 380.)

9 He also testified that he could no longer "play tennis, swim,

10 [or] hike."  (Id.)  He got out of breath "after like 10, or

11 maximum 15 minutes" if he tried to do things or moved around.

12 (AR 381.)  His voice was becoming "weaker," and if he spoke in a

13 loud voice he became "more fatigued."  (AR 381-82.)  The fatigue

14 "became worse after the surgery."  (AR 382.)  He testified that

15 "[b]efore the surgery, it was a little bit longer, 15, 20

16 minutes" before he became out of breath or felt tired.  (Id.)

17 When he felt tired, he had to "lie down[] or sit down" for "30

18 minutes[] to 45 minutes" before resuming even "very light"

19 activities.  (Id.)

20         3.   The ALJ's decision

21    The ALJ found Plaintiff's "statements concerning the

22 intensity, persistence and limiting effects of [his] symptoms"

23 "not entirely consistent with the medical evidence and other

24 evidence in the record."  (AR 365.)

25    The ALJ first considered the objective medical evidence

26 supporting Plaintiff's claims of fatigue, weakness, and shortness

27 of breath, noting that although "[h]istorical treatment records

28 document [his] diagnosis of coronary artery disease," he

1   "underwent stenting of [a] coronary artery" in 2008.  (AR 365.)
2   She noted that "[p]rogress notes from 2008 and 2009 reflect some
3   reports of chest pain, but no significant cardiac functional
4   abnormalities, with improvement[] in [Plaintiff's] reported
5   symptoms over that period."  (Id.)  Stress testing on September
6   4, 2009, "yielded the assessment of 'very good functional
7   capacity.'"  (AR 365 (quoting AR 227).)  A cardiology
8   consultation report from June 2011 indicated that Plaintiff "had
9   experienced no chest pain since 2008 and . . . reported playing
10  sports and remaining very active without difficulty."  (AR 365-66
11  (citing AR 350).)  In September 2011, Plaintiff "reported
12  increased fatigue," but progress notes indicated "inconsistent
13  medication compliance."  (AR 366 (citing AR 348).)  In December
14  2011, Plaintiff "reported the ability to play tennis for 30-45
15  minutes without severe fatigue."  (Id. (citing AR 344).)  She
16  also considered cardiology notes from May 2013, which
17  "indicate[d] that [Plaintiff] denied any shortness of breath,
18  dizziness, lightheadedness, palpitations, or syncope."  (Id.
19  (citing AR 278).)  She specifically noted that Plaintiff's
20  treating cardiologist stated on May 2, 2013, that he could "work
21  in any field without restrictions."  (Id. (citing AR 331).)  She
22  observed that treatment notes from November 2013 "reflect[ed] no
23  significant functional deficiencies upon physical examination[]
24  and no treatment recommendation beyond continuation of [his]
25  medications."  (Id.)  A July 14, 2014, cardiac evaluation report
26  showed "no reported sympomatology" and no "significant
27  irregularities."  (Id. (citing AR 315).)

28          The ALJ also discussed notes indicating that Plaintiff "had

a heart attack in November of 2015 and underwent five-vessel coronary bypass surgery." (Id. (citing AR 554-98, 746).) But she noted that "follow-up notes in 2016, 2017 and 2018 indicated [he] was doing well and he denied chest pains, shortness of breath, orthopnea, dizziness, syncope, palpitations, or lower extremity edema." (Id.) The ALJ also observed that Plaintiff's "diabetes mellitus was being conservatively managed with medication[]," "[h]is physical examinations were largely unremarkable for any acute cardiovascular or neurological issues," and he "was regularly encouraged to exercise at least 30 minutes a day by walking, which indicates that his doctor felt he was capable of greater exertion than the sedentary lifestyle he testified to at the hearing." (Id. (citing AR 699, 701, 703, 764, 782, 797).)

The ALJ discussed Plaintiff's treatment for right knee pain in April 2017. (Id.) But "[h]is examination indicated a negative Appley's [sic] test and no effusion." (Id.; see AR 609-10.) Plaintiff "was given a knee brace and referred to the orthopedics department." (AR 366-67 (citing AR 609-10, 617-18).) She also noted that "X-ray imaging of the joint showed normal findings," and there was "no indication of further treatment for knee pain or any other musculoskeletal condition." (AR 367 (citing AR 602-608, 662).) She remarked on the evidence documenting Plaintiff's obesity and observed that his "weight, including the impact on his ability to ambulate as well as his other body systems, has been considered." (Id.)

The ALJ summarized the medical records, stating:

Overall, the medical records indicate that

24

1    [Plaintiff's] history of coronary artery disease caused
2    minimal functional limitations prior to November 2015 in
3    light of the benign workups prior to that time, as well
4    as [his] reported physical activities that included
5    playing sports without significant fatigue or pain.
6    While he unfortunately had a heart attack in November of
7    2015, the notes convey that he recovered from the
8    incident and related bypass surgery relatively quickly,
9    as the subsequent examination and diagnostic findings
10   revealed little to no cardiovascular or neurological
11   abnormalities. [He] was also encouraged to exercise by
12   walking throughout his course of treatment.

13  (Id.)

14       The ALJ also discussed the medical-opinion evidence.  First,

15  Plaintiff "underwent a complete internal medicine evaluation by

16  Dr. Tamayo on July 16, 2013." (AR 366 (citing AR 284-94).)

17  Although Plaintiff reported "chest pain and shortness of breath

18  upon exertion," physical examination revealed "no physical

19  abnormalities," and he "demonstrated normal gait, strength,

20  sensation, and range of motion in all areas, with no neurological

21  deficiencies evident." (Id. (citing AR 286-91).)  The ALJ noted

22  that "Dr. Tamayo . . . opined that [Plaintiff] retained the

23  capacity to perform a range of work at the light exertional

24  level." (Id.)  She gave "little weight" to the opinion because

25  it did "not adequately take into account [Plaintiff's] subjective

26  reports of fatigue and shortness of breath on exertion." (Id.)

27       The ALJ also discussed the opinions of state-agency

28  physicians Phillips and Friedman, who opined that Plaintiff

1   "could perform a full range of light work." (AR 367 (citing AR
2   48-57, 59-69.)  She gave those opinions "little weight" as well
3   because the "evidence received at the time of the most recent
4   hearing supports a finding of greater functional limitation than
5   reflected in the opinions of these sources." (<u>Id.</u>)

6       Ultimately, the ALJ concluded that Plaintiff's symptoms
7   would limit him to a range of sedentary work and that he was
8   capable of performing his past relevant work as a sales manager
9   as generally performed in the national economy. (AR 364, 367-
10  68.)  Therefore, she found him not disabled. (AR 369.)

11      C.   <u>Analysis</u>

12      As an initial matter, the ALJ largely accepted Plaintiff's
13  self-reported limitations in finding that he was capable of less
14  than the full spectrum of sedentary work.  Indeed, his complaints
15  mostly concerned fatigue, weakness, and shortness of breath on
16  exertion (<u>see</u> AR 177 (questionnaire answers), 701 (reporting in
17  May 2016 that he gets "fatigued with exertion")), and the ALJ
18  concluded that the agency doctors' finding that he could perform
19  a range of light work did "not adequately take into account [his]
20  subjective reports of fatigue and shortness of breath on
21  exertion." (AR 366.)  Therefore, the ALJ limited him to "a range
22  of sedentary work." (AR 364);[21] <u>see</u> § 404.1567(a) (sedentary
23  work requires "lifting no more than 10 pounds at a time" and
24  "occasionally lifting or carrying articles like docket files,

25

26      [21] The ALJ noted Plaintiff's statement to a doctor in April
    2017 that he injured his knee a few weeks prior while "carrying a
27  heavy load" (AR 366-67 (citing AR 609-10, 617-18)), which was
    inconsistent with his allegations of being unable to lift or
28  carry much weight because of fatigue.

ledgers, and small tools"); <u>see also</u> DOT 163.167-018, 1991 WL
647311 (sales-manager position requires "exerting up to 10 pounds
of force occasionally" "and/or a negligible amount of force
frequently" "to lift, carry, push, pull, or otherwise move
objects, including the human body").  In finding his statements
"not entirely consistent" with the medical records (AR 365), the
ALJ implicitly rejected only his allegation that he needed 30 to
45 minutes of rest after engaging in 10 to 15 minutes of
activity.  (AR 364); <u>cf.</u> § 404.1567(a).

    To the extent she discounted Plaintiff's subjective
symptoms, she provided clear and convincing reasons supported by
substantial evidence for doing so.  First, she properly concluded
that his claims were inconsistent with the objective medical
evidence (<u>see</u> AR 365), which is a valid basis for discounting a
claimant's subjective symptom testimony.  <u>Morgan</u>, 169 F.3d at
600; § 404.1529(c)(2).  Second, she considered "other evidence"
from Plaintiff's medical sources, including "longitudinal record
of any treatment and its success or failure," SSR 16-3p, 2016 WL
1119029, at *6 (Mar. 28, 2016); § 404.1529(c)(3), the doctors'
opinions, and Plaintiff's daily activities.

    For example, contrary to Plaintiff's claims of disabling
fatigue, weakness, and shortness of breath from coronary artery
disease (<u>see</u> AR 177, 701), the objective medical evidence
demonstrated no significant cardiac functional deficits.  The
January 2015 echocardiogram showed normal findings.  (AR 719-20.)
The November 2015 echocardiogram demonstrated septal-wall
dyskinesis and mild concentric left ventricular hypertrophy, but
no diastolic dysfunction, preserved right ventricular function,

and otherwise normal findings.  (AR 709-10.)  The progress notes
consistently demonstrated normal physical-examination findings.
(See, e.g., AR 327, 329, 332, 334, 336, 338, 340, 342, 344, 346,
348, 350, 699, 701, 703, 705, 707, 711-12, 713, 715, 717.)

        As to the other evidence, the treatment records demonstrated
that Plaintiff's symptoms improved following his 2008 stent and
2015 coronary bypass surgery.  (See AR 350 (Plaintiff reporting
in June 2011 that he had had no further angina since his stent
placement in May 2008 and that he could play sports and remain
"very active" without chest pain or shortness of breath), 699-700
(Plaintiff reporting in December 2016 that he was doing well and
denying any chest pain, shortness of breath, orthopnea,
dizziness, syncope, palpitations, or lower extremity edema), 773
(Plaintiff reporting in February 2018, seven months after his
date last insured, that he was walking "a lot nowadays"; see also
AR 367 (ALJ finding Plaintiff's statements inconsistent with
medical evidence and that evidence as whole supported RFC).)
Indeed, in the periods following the 2008 stent and the 2015
coronary bypass surgery, Plaintiff repeatedly denied cardiac
symptoms and was consistently encouraged to exercise regularly.
(See, e.g., AR 702 (Dr. Deits observing in May 2016 that
Plaintiff should "progressively increase his exercise" and
finding that he was not "disabled from a cardiac POV"), 764
(Plaintiff reporting in March 2018 that he had no chest pain,
shortness of breath, orthopnea, dizziness, syncope, palpitations,
or lower extremity edema).)

        The ALJ's finding that the objective and other medical
evidence undermined his symptom allegations was supported by the

28

record.  The echocardiogram results, physical-examination

findings, doctors' opinions, and Plaintiff's lack of cardiac

symptoms all indicated that he could perform sedentary work.

　　　Notably, Plaintiff does not identify any record evidence

undermining the ALJ's discounting of his subjective symptom

statements as "not entirely consistent" with the medical and

other evidence.  (AR 365; see generally J. Stip. at 4-13.)

Instead, he contends that the ALJ did not articulate a

"sufficient articulated rationale" for discounting them (J. Stip.

at 7), arguing that her reasons were inadequate under Bunnell v.

Sullivan, 947 F.2d 341, 345 (9th Cir. 1991) (en banc) (J. Stip.

at 8; see id. at 7-11).  Although Plaintiff is correct that

subjective symptom testimony cannot be rejected on the sole basis

that it is not fully corroborated by objective medical evidence,

see Burch, 400 F.3d at 680 (citing Bunnell, 947 F.2d at 345);

§ 404.1529(c)(2), the ALJ did not discount his symptoms solely on

that basis.  She also found them inconsistent with "other

evidence" in the medical records, including the medical-opinion

evidence and Plaintiff's daily activities.  (See, e.g., AR 365-66

(noting statement in Plaintiff's treatment records that he

reported playing sports and remaining very active without

difficulty); see also AR 366 (noting opinion from Plaintiff's

treating cardiologist that he could work in any field without

restrictions).)

　　　The ALJ's holistic consideration of the treatment records

beyond simply the "objective medical evidence" in them was

proper.  See § 404.1529(c)(2) & (3); George v. Berryhill, No.

1:16-cv-00335-GSA, 2017 WL 3383117, at *11 (E.D. Cal. Aug. 7,

2017) (ALJ properly discounted symptoms given lack of "objective" medical evidence under § 404.1529(c)(2) and inconsistences with medical opinions and observations about plaintiff's symptoms). And although Plaintiff claims that the ALJ did not "provide specific, clear, and convincing reasons for his [sic] credibility determinations beyond the boilerplate" (J. Stip. at 7), her decision, as discussed, reflects a careful reading of all the evidence, including the trajectory of Plaintiff's symptoms before and after his stent placement and coronary bypass surgery (see AR 365-67).

Plaintiff argues that the ALJ did not articulate his daily activities as a reason to discount his testimony. (J. Stip. at 10.) He is incorrect. In addressing the inconsistencies in his symptom testimony, the ALJ specifically noted that he reported playing sports and remaining very active without difficulty and playing tennis for 30 to 45 minutes without severe fatigue. (AR 365-66.)

The ALJ stated clear and convincing reasons, supported by substantial evidence, to partially discount Plaintiff's subjective symptom testimony. Reversal is not warranted.

**VI.  CONCLUSION**

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[22] IT IS ORDERED that judgment be entered DENYING Plaintiff's request for remand, AFFIRMING the Commissioner's

---

[22] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

decision, and DISMISSING this action with prejudice.

DATED: May 29, 2020

_____
JEAN ROSENBLUTH
U.S. MAGISTRATE JUDGE

31